IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| BNSF RAILWAY COMPANY, a Delaware Corporation, | CV 21-109-BLG-SPW-KLD |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATIONS |
| TERRY ROD, | |
| Defendant. | |

Plaintiff BNSF Railway Company ("BNSF") brings this action pursuant to the Montana Administrative Procedure Act, Mont. Code Ann. § 2-4-701 et seq., seeking judicial review of a final administrative decision by the Montana Human Rights Commission ("MHRC") on Defendant Terry Rod's ("Rod") disability discrimination claim. The MHRC's Final Agency Decision should be affirmed in part and reversed in part as set forth below.

## I.  Factual and Procedural Background[1]

In October 1994, Rod began working in a union position as a machinist at BNSF's Diesel Shop in Glendive, Montana. (Doc. 1-5 at 3 ¶ 2). BNSF machinists perform mechanical work on locomotives, and Rod's duties generally included a

---

[1] The facts are taken primarily from the Hearing Officer's January 29, 2021 decision on remand. (Doc. 1-5).

range of maintenance and repair work. (Doc. 1-5 at 4 ¶ 9). From 1994 to 2007, Rod was fully qualified and physically able to perform all of his assigned duties, and he worked without any restrictions during this period. (Doc. 1-5 at 4 at ¶ 10).

Sometime in 2006, Rod was diagnosed with idiopathic spastic paraparesis, which affects his lower extremities and causes him to have a spastic gait. (Doc. 1-5 at 6 ¶ 15; Hearing Tr. 229:24-230:2). In February 2007, Rod's supervisors began to have concerns about whether he could safely perform his job duties based on their observations that he was having issues with his gait and balance. (Doc. 1-5 at 6 ¶ 16). BNSF required Rod to undergo occupational testing and medical reviews to determine what work he could safely perform. (Doc. 1-5 at 6-9 ¶¶ 15-28). Based on these assessments, BNSF modified Rod's duties to allow him to perform his machinist position at the sedentary level. (Doc. 1-5 at 9 ¶ 29). From 2007 through May 2017, Rod relied on his seniority in bidding on machinist jobs. (Doc. 1-5 at 3 ¶8). For whatever machinist position he was awarded, BNSF would assign him to perform "other duties" that included his modified, sedentary duties at the Glendive Diesel Shop. (Doc. 1-5 at 3 ¶ 8, 9 ¶ 30). During this period, Rod's machinist position had two informal titles: Shop Support and Warehouse Coordinator.  (Doc. 1-5 at 12 ¶ 42).

As a result of furloughs ordered by BNSF in 2016 and 2017, the Glendive Diesel Shop went from a shop with 140 to 150 employees to a shop with 65

employees, and from a three-shift shop to a one-shift shop. (Doc. 1-5 at ¶¶ 49-51). The reduction in manpower required Shop Superintendent Gabe Schlosser to conduct a complete realignment of the shop's workforce, and employees were required to bid on the newly crafted positions. (Doc. 1-5 at 13 ¶ 53, 14 ¶55).

In May 2017, Rod bid on three positions: Machinist Lead Relief, Machinist Lead, and Machinist. (Doc. 1-5 at 14 ¶¶ 58-59). The Machinist Lead had traditionally been an administrative and sedentary position that involved monitoring several computer screens and receiving electronic reports regarding BNSF locomotives and required maintenance. (Doc. 1-5 at 17 ¶ 73). In light of the furloughs, however, Schlosser wrote the job description for the two Machinist Lead positions to also include traditional machinist duties, such as conducting facility audits that had previously been conducted by service track supervisors, working on the service track, and assisting exempt employees with safe production and running the shop. (Doc. 1-5 at 15 ¶ 64). Schlosser did not consider Rod's accommodations when creating the new positions but was focused on ensuring that staffing levels at the Glendive Diesel Shop met BNSF's needs. (Doc. 1-5 at 16 ¶ 67).

At some point during the bidding process, Schlosser determined there was not enough sedentary work available to accommodate Rod's work restrictions. (Doc. 1-5 at 15 ¶ 61). Schlosser did not believe that Rod could perform the two

Machinist Lead positions because they would require greater physical work than Rod's restrictions would allow. (Doc. 1-5 at ¶ 69). Effective May 8, 2017, Rod was awarded the newly posted Machinist position. (Doc. 1-5 at 16 ¶ 68). At the end of Rod's shift on May 8, 2017, however, BNSF informed Rod that he was being removed from service and placed on medical leave due to his disability. (Doc. 1-5 at 16 ¶ 70; Doc. 1-6 at 3). Schlosser told Rod that if he "didn't have all [his] restrictions released, [h]e didn't have a job anymore." (Doc. 1-5 at 16 ¶ 70).

On October 30, 2017, Rod filed an administrative complaint with the Montana Department of Labor and Industry alleging that BNSF had discriminated against him in employment because of a disability in violation of the Montana Human Rights Act (MHRA). (Doc. 1-5 at 1; Doc. 1-6 at 1). The case went before the Office of Administrative Hearings (OAH), and a contested case hearing was held in early October 2018. (Doc. 1-5 at 1; Doc. 1-6 at 1). On November 27, 2019, the Hearing Officer issued a decision finding in Rod's favor. (Doc. 1-2). The Hearing Officer found that BNSF illegally discriminated against Rod by failing to provide reasonable accommodation for his disability, and awarded front pay, back pay, and emotional distress damages. (Doc. 1-2 at 41-42). The Hearing Officer concluded that Rod's request for front pay until the age of 65 was "too speculative to be a reasonable award of damages," however, and limited his front pay damages award to four years based on the guidance provided by the Montana Wrongful

Discharge from Employment Act (WDEA), "which allows for recovery of lost wages for a maximum of four years from the date of discharge." (Doc. 1-2 at 38).

Both parties appealed, and on June 17, 2020 the MHRC issued a decision affirming in part and reversing in part, and remanding the case to the OAH for further proceedings. (Doc. 1-3). The MHRC found that the Hearing Officer erred by relying "solely on the guidance of the WDEA cap" and the front pay damages award of four years was not supported by the record. (Doc. 1-3 at 7-8). The MHRC remanded the case "to the Hearing Officer to determine an appropriate front pay damages award based on the evidence in the record." (Doc. 1-3 at 8).

Before the MHRC issued its order, BNSF announced the closure of several of its facilities, including the Glendive Diesel Shop. (Doc. 1-4 at 2). On remand, the Hearing Officer denied BNSF's request to reopen the record and consider evidence regarding, or take judicial notice of, the closure of the Glendive Diesel Shop. (Doc. 1-4 at 2-3). On January 29, 2021, the Hearing Officer issued her decision on remand, again finding that BNSF illegally discriminated against Rod by failing to provide reasonable accommodation for his disability. (Doc. 1-5). The Hearing Officer awarded Rod back pay and emotional distress damages, and increased the front pay award to the age of 65. (Doc. 1-5 at 37-42).

BNSF appealed again to the MHRC, which affirmed the Hearing Officer's decision on June 23, 2021. (Doc. 1-6). One month later, on July 23, 2021, BNSF

filed this action seeking judicial review of the MHRC's final administrative

decision pursuant to Mont. Code Ann. § 2-4-702. (Docs. 1 & 2).

## II.   Legal Standards

### A.   Standard of Review

Where, as here, the prerequisites for diversity jurisdiction are met, federal

district courts have subject matter jurisdiction over cases involving "on-the-record

review of a Montana administrative agency decision." *BNSF Ry. Co. v. O'Dea*, 572

F.3d 785, 791 (9th Cir. 2009). The district court reviews a final administrative

decision to determine "whether the agency's findings of fact are clearly erroneous

and whether the agency's interpretation and application of law are correct." *Denke*

*v. Shoemaker*, 198 P.3d 284, 295 (Mont. 2008).

"A factual finding is clearly erroneous if it is not supported by substantial

evidence in the record, if the fact-finder misapprehended the effect of the evidence,

or if a review of the record leaves the court with a definite and firm conviction that

a mistake has been made." *Denke*, 198 P.3d at 295. "Substantial evidence is

evidence that a reasonable mind might accept as adequate to support a conclusion.

It consists of more than a mere scintilla of evidence but may be less than a

preponderance." *Blaine County v. Stricker*, 394 P.3d 159, 165 (Mont. 2017)

(internal question marks and alteration omitted). The court views the evidence "in

the light most favorable to the prevailing party when determining whether findings

of fact are supported by substantial credible evidence." *Blaine County*, 394 P.3d at 165. "The court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact," and if additional evidence is needed the court must remand to the agency for that purpose. Mont. Code Ann. § 2-4-704(2).

The "standard of review for an administrative agency's conclusions of law is whether its interpretation of the law was correct." *Cambra Foods v. Mont. Dep't of Revenue*, 925 P.2d 855, 856 (Mont. 1996). The interpretation of an agency's remand order is a question of law requiring de novo review, as is the interpretation of a procedural rule. *In re Molasky*, 843 F.3d 1179, 1184 (9th Cir. 2016) (interpretation of a prior decision is a question of law); *Yellowstone County v. Drew*, 160 P.3d 557, 560 (Mont. 2007) (procedural rule).

### B.     Disability Discrimination

The MHRA prohibits discrimination in employment because of physical or mental disability. Mont. Code Ann. § 49-2-303(1)(a). "Discrimination under the MHRA includes 'the failure to make reasonable accommodations that are required by an otherwise qualified person who has a physical or mental disability.'" *Alexander v. Montana Developmental Center*, 430 P.3d 90, 94 (Mont. 2018) (quoting Mont. Code Ann. § 49-2-101(19)(b)). The term "reasonable accommodation" means "[m]odifications or adjustments to the work environment,

or to the manner or circumstances under which the position held or desired is customarily performed, that enable [a qualified] person individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). "An accommodation that would require an undue hardship … is not a reasonable accommodation." Mont. Code. Ann. § 49-2-101(19)(b).

The Montana Supreme Court looks to federal law for guidance when interpreting the MHRA. *Alexander*, 430 P.3d at 94. Disability discrimination claims under the MHRA are typically analyzed using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). See *Conlan v. Costco Wholesale Corp.*, 2021 WL 2354745, at *8 (D. Mont. June 9, 2021). "Under the *McDonnell* framework, the plaintiff must first establish a prima facie case of discrimination." *Conlan*, 2021 WL 2354745, at *8. To establish a prima facie case of disability discrimination under the MHRA, a plaintiff must prove that: (1) he is disabled; (2) he was qualified to perform the essential functions of his job; and (3) that he suffered an adverse employment decision because of his physical or mental disability. *Conlan*, 2021 WL 2354745, at *8-9 (citing *Pannoni v. Board of Trustees*, 90 P.3d 438 (Mont. 2004)). If the plaintiff succeeds making out a prima facie case, "the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions." *Conlan* 2021 WL 2354745, at *8 (citing *McDonnell Douglas*, 411 U.S. at

8

802-803.) "Finally, if the defendant carries its burden, the plaintiff must then prove that the reason offered by the defendant was not its true reason, but rather a pretext for discrimination." *Conlan*, 2021 WL 2354745, at *8 (citing *McDonnell Douglas*, 411 U.S. at 804-805).

But in cases where "the employer acknowledges that it relied upon the plaintiff's [disability] in making its employment decision," the Montana Supreme Court has held that the *McDonnell Douglas* test "is unnecessary because the issue of the employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by the defendant…and the plaintiff has direct evidence of discrimination on the basis of his or her disability." *Reeves v. Dairy Queen, Inc.*, 953 P.2d 703, 706-707 (Mont. 1998) (quoting *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1182 (6th Cir. 1996)).

Assuming the plaintiff in such a case is in fact disabled, the determinative issue will not be the employer's intent, but "whether the employee is 'otherwise qualified' with or without reasonable accommodation." *Laudert v. Richland County Sheriff's Dept.*, 7 P.3d 386, 391 (Mont. 2000) (citing *Reeves*, 953 P.2d 703

## III.   <u>Discussion</u>

BNSF argues the MHRC's final agency decision is clearly erroneous because the Hearing Officer's disability discrimination determination and front pay damages award are not supported by substantial evidence.

9

### A.   Disability Discrimination Determination

The Hearing Officer began her disability discrimination analysis with the premise that "BNSF removed Rod from service in May 2017 due to the determination by BNSF personnel that Rod could not safely or effectively perform a machinist's job duties due to his physical disability." (Doc. 1-5 at 25). Because "the reason for Rod's removal from service in May 2017 [was] not disputed," the Hearing Officer did not apply the *McDonnell Douglas* test and instead focused her discussion on the issue of whether Rod was "otherwise qualified for the machinist positions with or without accommodation." (Doc. 1-5 at 25).

The Hearing Officer found that Rod was otherwise qualified to perform the machinist lead positions with an accommodation, and that accommodating Rod would not have been unreasonable given his years of service with BNSF and the size and resources available to BNSF. (Doc. 1-5 at 21, 25, 33). Having determined that Rod was otherwise qualified for the machinist lead positions with an accommodation, and that the BNSF failed to reasonably accommodate Rod, the Hearing Officer concluded that BNSF illegally discriminated against Rod on the basis of disability when it removed him from service in May 2017. (Doc. 1-5 at 45).

BNSF challenges the Hearing Officer's disability discrimination determination, arguing the Hearing Officer erred in finding that Rod was otherwise

qualified for the machinist lead positions, and that BNSF failed to accommodate Rod. (Doc. 20 at 12).

    1.    <u>Hearing Officer's finding that Rod was otherwise qualified for the machinist lead positions with an accommodation</u>

"A person with a physical or mental disability is qualified to hold an employment position 'if the person can perform the essential functions of the job with or without a reasonable accommodation for the person's physical or mental disability.'" *McDonald v. Dept. of Environmental Quality*, 214 P.3d 749, 758-759 (Mont. 2009) (quoting Mont. Admin R. 24.9.606(2) and citing 29 C.F.R. app. § 16309 ("An individual with a disability is 'otherwise qualified' … if he or she is qualified for a job, except that, because of the disability, he or she needs a reasonable accommodation to be able to perform the job's essential functions.")). "If a person is unable to perform the essential job functions, even with a reasonable accommodation, he or she is not a qualified person." *Pannoni,* 90 P.3d at 444.

As these standards reflect, to determine whether a person is "otherwise qualified" for an employment position, it is necessary to determine what the essential functions of the position are. Under analogous federal law, "the term 'essential functions' means the 'fundamental job duties of the employment position the individual with a disability holds or desires.'" *Conlan*, 2021 WL 2354745 at *10 (quoting 29 C.F.R. § 1630.2(n)(1)). "The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1).

Identifying the essential functions of a job is a "highly fact-specific inquiry." *Cripe v. City of San Jose*, 261 F.3d 877, 888 n. 12 (9th Cir. 2001).

In evaluating the essential functions of a job under the MHRA's federal counterpart, the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq., "consideration shall be given to the employer's judgment as to what functions of the job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Under the ADA's implementing regulations,

> A job function may be considered essential for any of several reasons including, but not limited to, the following:
>
> (i) The function may be essential because the reason the position exists is to perform that function; (ii) The function may be essential because of the limited number of employees available whom the performance of that job function can be distributed; and/or (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n)(2).  In addition, evidence of whether a particular job function is essential may include:

> (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

BNSF maintains that in finding Rod was otherwise qualified for the machinist lead positions, the Hearing Officer "misapprehended the effect of the evidence" in identifying the essential functions of the positions. (Doc. 20 at 12).

The Hearing Officer focused this portion of her discussion on the Machinist Lead positions, finding specifically that "Rod was qualified to perform the essential functions of the Machinist Lead positions with an accommodation." (Doc. 1-5 at 21). Although "Rod's physical disability limited his ability to perform the more physical requirements of the positions," the Hearing Officer determined that "those duties were not essential functions and could have been altered to accommodate Rod."[2] (Doc. 1-5 at 21).

BNSF contends that in making this finding, the Hearing Officer ignored Rod's own description of his machinist job in a Railroad Retirement Board disability benefit application he completed on May 22, 2017. (Doc. 20-16). Rod wrote that the essential duties of the machinist position included performing maintenance work on locomotives, which required walking on uneven terrain, and climbing on and under locomotives. (Doc. 20-16 at 5). Rod indicated that the

---

[2] To the extent the Hearing Officer also found that Rod was otherwise qualified to perform the machinist position he bid on in May 2017, the Court need not address whether she erred in doing so because, as discussed below, her finding that Rod was otherwise qualified to perform the machinist lead positions is supported by substantial evidence.

position also required frequent balancing and lifting of up to 25 pounds and occasional crouching, squatting, stooping and crawling. (Doc. 20-16 at 5-6). Rod certified that he was restricted from performing these exertional activities, and he was ultimately awarded disability benefits. (Doc. 20-16 at 1, 7).

The Hearing Officer addressed Rod's description of the machinist position in her discussion of whether BNSF failed to reasonably accommodate Rod's disability. (Doc. 1-5 at 34). The Hearing Officer recognized that as described in a BNSF "Statement of Job Awareness" form, the machinist position at the Glendive Diesel Shop required many of the same physical activities listed by Rod on his disability application form. (Doc. 1-5 at 4 ¶ 13; Hearing Exh. 29). As discussed in the Hearing Officer's decision, the record reflects that from 2007 until May 2017, BNSF accommodated Rod's physical limitations by modifying those job duties and allowing him to perform the machinist position at a sedentary level. (Doc. 1-5 at 9 ¶¶ 28-31).

As it does in briefing before the Court, BNSF argued at the agency level that although it had "accommodated Rod for ten years," it "was unable to continue doing so due to the staffing changes at the Glendive Diesel Shop as a result of economic conditions beyond the control of BNSF." (Doc. 1-5 at 26). BNSF makes essentially the same argument here, contending that due to the downturn in business in 2016 and 2017, it implemented furloughs and created new machinist

and machinist lead positions that were posted and bid on by BNSF employees, including Rod. (Doc. 20 at 15).

BNSF relies on a Seventh Circuit case for the proposition that "employers do not have to maintain positions or job structures that provide reasonable accommodations if the employer finds, for legitimate business reasons, that the position or job structure should be eliminated." *Dunderdale v. United Airlines, Inc.,* 807 F.3d 849, 855-56 (7th Cir. 2015). See also *Thompson v. Heiner's Bakery*, 2012 WL 1835709, *3 (W.D. Va. May 18, 2012) ("As business necessity evolves, so too can a job's essential functions."); *Higgins v. Md. Dept. of Agriculture*, 2012 WL 665985 at *7 n.7 (D. Md. Feb. 28, 2012) (explaining that "employers may change an employee's responsibilities or adopt new management policies so long as the changes or policies are legitimate and not motivated by discrimination").

BNSF claims it had the right to reorganize its workforce for legitimate business reasons and was not required to eliminate essential functions from the machinist positions in order to accommodate Rod's disability. BNSF takes the position that the Hearing Officer essentially punished it for having accommodated Rod for several years by not requiring him to perform all of the essential functions of the machinist position, and improperly conflated the "other assigned duties" under which BNSF accommodated Rod during that period with the essential functions of the machinist jobs he bid on in 2017. See *Faidley v. UPS of America,*

15

*Inc.*, 889 F.3d 933, 943 (8th Cir. 2018) ("If an employer 'bends over backward to accommodate a disabled worker … it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.'") (citation omitted); *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 25-26 (1st Cir. 2001) ("[E]ven when an employer and employee have made arrangements to account for the employee's disability – a court must evaluate the essential functions of the job without considering the effect of the special arrangements.").

BNSF argues the essential functions of the Machinist Lead positions it posted in May 2017 included several significant physical requirements, and the Hearing Officer erred in finding otherwise. BNSF takes particular issue with the Hearing Officer's determination that: "Rod was qualified to perform the essential functions of the Machinist Lead positions with an accommodation. While Rod's physical disability limited his ability to perform the more physical requirements of the positions, those duties were not essential functions and could have been altered to accommodate Rod." (Doc. 1-5 at 21 ¶ 103). BNSF argues the Hearing Officer's finding as to the essential functions of the Machinist Lead positions ignored BNSF's job postings describing significant physical requirements, and is not supported by substantial evidence.

Review of the record shows otherwise. The Hearing Officer began by

discussing the May 2017 job bulletins, noting that "[t]he only duty listed in the bulletined leadman machinist positions that is at issue is the duty to '[i]nspect and monitor RC building work environment'," because the remaining duties required knowledge of the computer programs used by BNSF "and its policies and procedures – all of which [were] well within Rod's expertise and well within his medical restrictions." (Doc. 1-5 at 26). As the Hearing Officer thus recognized, "the crux of the issue is whether the physical demands of the job, as set forth in the job bulletin[s], are an essential function of the position[s]." (Doc. 1-5 at 26).

The Hearing Officer found they were not, and in doing so relied on testimony provided by several BNSF employees during the contested case hearing in October 2018. (Doc. 1-5 at 28-32). For example, Samuel Burman, who was working as lead machinist, testified that the position required a lot of computer desk work, and based on his experience, Rod would be able to do the job from his wheelchair. (Doc. 1-5 at 28-29, citing Hearing Tr. 311:16-313:1, 315:4-13). Gary Whitmore, who had worked as a machinist for approximately 14 years and as a leadman for approximately five months beginning in May 2017, confirmed that he never did any work outside of sitting at a desk. (Doc. 1-5 at 29, citing Hearing Tr. 351:22-352:10; 355:23-356:1). BNSF employee John Denny corroborated that when he worked at the Glendive Diesel Shop, the leadman's job "consisted of being in the office" and the leadman machinists "never left the desk." (Doc. 1-5 at

30, citing Hearing Tr. 119:2-13; 121:14-17). The Hearing Officer also relied on the deposition testimony of longtime BNSF employee Brent White, who explained that the dayshift leadman position was a desk job "in real life" and the dayshift leadmen "sit at a desk for eight hours" a day. (Doc. 1-5 at 30-31, citing White Depo. Tr. 29:17-30:14; 32:14-19; 32:14-19).

The Hearing Officer acknowledged testimony provided by BNSF's general foreman, Gabe Schlosser, who explained that the leadman position Rod bid on was a "working leadman position," and would be expected to assist the machinist working the service track when necessary and perform various physical tasks. (Doc. 1-5 at 28, citing Hearing Tr. 515:8-516:13). The Hearing Officer found that Schlosser's testimony as to the physical requirements of leadman position was undercut by an email he sent several days before the hearing adding visual inspections to the leadman's duties. (Doc. 1-5 at 31). The Hearing Officer found that since Rod's removal in May 2017, the functions described by BNSF as essential "were not being performed on a regular basis by any worker in the leadman machinist position," which had apparently "escaped BNSF's notice given that Schlosser only addressed it just prior to the hearing." (Doc. 1-5 at 31).

The Hearing Officer considered Schlosser's testimony that he intended the leadman position to include more physical duties, but found based on the testimony of other BNSF employees whom she considered more credible that there was a

18

"stark contrast between the duties outlined in the bulletined job posting and the 'real life' duties of the position," particularly with respect to the dayshift position bid on by Rod. (Doc. 1-5 at 31).

Ultimately, the Hearing Officer found that the dayshift leadman position was "primarily a sedentary position with the physical labor being a function of the position but not an essential function." (Doc. 1-5 at 32). Based on what the Hearing Officer found was "credible testimony" by several BNSF employees, the Hearing Officer found "that the duty to '[i]nspect and monitor the RC building work environment' was not an essential function of the machinist positions at the Glendive Diesel Shop." (Doc. 1-5 at 32).

Although BNSF argues there was not enough work to support a full-time sedentary position after it reduced and reorganized the workforce at the Glendive Diesel Shop (Doc. 20 at 20), substantial evidence of record supports the Hearing Officer's finding to the contrary. The Hearing Officer noted that the machinist leadman position had traditionally been a sedentary position, and that BNSF had been able to accommodate Rod in a sedentary machinist position without issue for ten years. (Doc. 1-5 at 35). The Hearing Officer then pointed to evidence that there was still sufficient sedentary machinist work available in the materials department of the shop even after May 2017. The Hearing Officer noted that the materials department, which offered work that could be performed by an individual in a

wheelchair or using other adaptive equipment, had experienced overtime and

increased staffing needs since Rod was removed from service in May 2017. (Doc.

1-2 at 21).

For example, the Hearing Officer relied on testimony by Burman, who had

worked as a machinist at the Glendive Diesel Shop for 13 years, and as a machinist

leadman for approximately three months at the time of the hearing in October

2018. (Doc. 1-2 at 19 citing Hearing Tr. 307:16-18; 311:16-24). Burman testified

that that the materials shop had been steadily busy since May 2017, and that in the

weeks before the hearing BNSF had additional employees in the materials

department performing the type of administrative and warranty work that Rod had

previously done. (Hearing Tr. 308:2-309:12). The Hearing Officer also relied on

testimony by Whitmore, who similarly stated that other employees without

physical disabilities had been performing Rod's duties in the materials department

of the Glendive Diesel Shop since Rod was removed from service in May 2017.

(Doc. 1-2 at 20, citing Hearing Tr. 354:20-355:5). Whitmore testified that

employees had been assigned to work overtime during the period following Rod's

removal from service, and believed there was enough sedentary-type work in the

materials department to support a full-time position. (Hearing Tr. 362:7-20;

375:13-22).

While BNSF focuses on contradictory testimony by other BNSF employees,

including Schlosser and Rod's former supervisor Richie Crisafulli, the Court may

not substitute its judgment for that of the Hearing Officer as to the weight of the

evidence. Having reviewed the record, the Court finds the Hearing Officer's

determination that Rod was "an 'otherwise qualified' individual who can perform

the essential functions of the machinist leadman positions with an accommodation"

(Doc. 1-5 at 33) is supported by substantial evidence and is not clearly erroneous.

> 2.    Hearing Officer's finding that BNSF failed to reasonably
>        accommodate Rod

Having determined that Rod was otherwise qualified to perform the

machinist lead positions, the Hearing Officer found that BNSF failed to reasonably

accommodate Rod. (Doc. 1-5 at 33). BNSF challenges this finding, arguing there

were no reasonable accommodations that would have enabled Rod to perform the

essential functions of the machinist lead positions. Again, BNSF takes the position

that it was not required to eliminate essential job functions to accommodate Rod's

disability. As detailed above, however, the Hearing Officer's finding that the

physical duties set forth in the job bulletin were not essential functions of those

positions is supported by substantial evidence.

To the extent BNSF argues it could not have reasonably accommodated

Rod's disability because there was not enough sedentary work to support a full-

time sedentary position, the Hearing Officer cited substantial evidence to the

contrary. As discussed above, testimony by several BNSF employees demonstrated

that even after BNSF reorganized staffing at the Glendive Diesel Shop, there was enough sedentary work in the materials department to support a full-time machinist lead position.

The Hearing Officer found that accommodating Rod would not have been unreasonable given BNSF's size and resources, and Rod's many years of service with the company. (Doc. 1-5 at 21-22, 35). The Hearing Officer relied in part on hearing testimony by Burman and Doug Byron, who explained that as lead machinists, they had not performed any physical labor in relation to audits, portions of which could be performed using computers and cameras in the yard, and that other employees were available to assist with certain tasks, such as placing blue cards used for inspections in locomotives. (Doc. 1-5 at 18-19, citing Hearing Tr. 160:11-164:12; 171:18-22; 172:14-22; 315:14-318:5; 321:11-322:3). The Hearing Officer also cited a rehabilitation report by vocational rehabilitation consultant Margot Luckman, who concluded that Rod could have continued to work as a machinist lead at the Glendive Diesel Shop with reasonable accommodations. (Doc. 1-5 at 21 ¶ 103; Doc. 21-5).

In addition, the Hearing Officer pointed to Rule 24, the faithful service rule, in the Collective Bargaining Agreement in place during the relevant period, which provides in part that "[e]mployees who have given long and faithful service to the Company and who have become unable to satisfactorily handle their normal

assignments, shall be given consideration for transfer to other work as may be available within their own craft when practical do so…." (Doc. 1-5 at 4; Hearing Exh. 33). The Hearing Officer found with adequate support in the record that given BNSF's size and resources, it would not have been unduly burdensome for BNSF to "accommodate Rod in accordance with Rule 24, as well as its previous practice of aiding those long-term employees who, through physical injury or impairment, are unable to perform their assigned duties without such an accommodation." (Doc. 1-5 at 21-22).

Finally, as Rod points out, Glendive Diesel Shop supervisors Crissafulli and Schlosser provided uncontroverted testimony that they were not consulted by BNSF's labor relations, human relations, or medical departments to consider accommodations for Rod, and the field manager for BNSF's medical department testified that he did nothing to modify or accommodate any job for Rod. (Doc. 21 at 20; Hearing Tr. 485:17-487:13; 552:5-553:20).

For the reasons discussed above, the Court finds the Hearing Officer's decision that BNSF illegally discriminated against Rod on the basis of disability when it removed him from service in May 2017, and failed to reasonably accommodate his disability is supported by substantial evidence. Thus, this aspect of the agency's final decision should be affirmed.

### B. Damages Award

The Hearing Officer found that Rod was harmed as a result of BNSF's decision to remove him from service, and awarded him back pay, front pay, and emotional distress damages. (Doc. 1-5 at 36-44). BNSF challenges the front pay award on two grounds. First, BNSF argues the Hearing Officer erred on remand by refusing to consider evidence of the Glendive Diesel Shop closure, and the MHRC erroneously affirmed that decision. Second, BNSF contends the Hearing Officer misapprehended the medical evidence in concluding that Rod could work for 13 more years, and awarding front pay for that period.

In its June 17, 2020 order remanding this matter to the OAH for further proceedings, the MHRC found that the Hearing Officer erred by relying solely on guidance provided by the WDEA in limiting Rod's front pay damages award to four years. (Doc. 1-3 at 8). The MHRC remanded the case "to the Hearing Officer to determine an appropriate front pay damages award based on the evidence in the record." (Doc. 1-3 at 8). It noted that the MHRA provides a "make whole" remedy that would allow "any reasonable measure to correct the discriminatory practice and to rectify any harm." (Doc. 1-3 at 8, citing Mont. Code. Ann. § 49-2-506(1)(b)).

Before the MHRC issued its remand order, BNSF announced the closure of the Glendive Diesel Shop. (Doc. 1-4 at 2). The shop permanently closed on July 7, 2020. (See e.g. Doc. 1-6 at 5). On remand, BNSF asked the Hearing Officer to

reopen the record to take evidence regarding, or judicial notice of, the shop's closure. (Doc. 16-3, at 2). The Hearing Officer denied BNSF's request in a written order dated August 28, 2020. (Doc. 1-4). The Hearing Officer found she was bound by the MHRC's directive to recalculate the front pay damages award "based on the evidence in the record," and concluded she did not have authority to reopen the record to take additional evidence on remand. (Doc. 1-4, at 2-3). The MHRC affirmed, finding "no abuse of discretion in the Hearing Officer's August 28, 2020 order declining to reopen the record and declining to take judicial notice of the July 7, 2020 closure of the [Glendive Diesel Shop]." (Doc. 1-6 at 5).

BNSF challenges this decision, and contends the MHRC erred as a matter of law in concluding that the Hearing Officer did not abuse her discretion by declining to reopen the record and take judicial notice of the shop closure. The scope of a mandate like the MHRC's remand order is a question of law that is subject to de novo review. See e.g. *In re Molasky*, 843 F.3d at 1184. The MHRC treated the Hearing Officer's order declining to reopen the record as an evidentiary ruling, however, and reviewed it for an abuse of discretion. (Doc. 1-6 at 5). BNSF argues, and the Court agrees, that the MHRC applied the wrong standard of review to the Hearing Officer's ruling on this issue. Because the Hearing Officer's order declining to reopen the record was based on her interpretation of the remand order, the MHRC erred in reviewing the order for an abuse of discretion and should have

conducted a de novo review.

BNSF maintains the Hearing Officer erred as a matter of law by interpreting the MHRC's remand order as prohibiting her from reopening the record to consider new evidence that was materially relevant to the front pay damages award. The Court agrees.

The Hearing Officer based her decision not to consider the evidence entirely on one case, *Glick v. State By and Through Montana Dept. of Institutions*, 528 P.2d 686 (Mont. 1974). In *Glick*, several state employees filed suit against the state seeking payment of overtime wages for a specific two-year period. *Glick*, 528 P.2d 686. After a trial, the district court entered judgment in favor of the plaintiffs, and the state appealed. *Glick*, 528 P.2d at 686. The Montana Supreme Court found that the district court erred in computing the number of hours worked, and remanded with orders for the district court "to recompute the hours worked." *Glick*, 528 P.2d at 687. At the hearing on remand, which was held before a different judge, the state attempted to introduce agency records as evidence showing errors in a summary the court had previously relied on. *Glick*, 528 P.2d at 687. The court refused to admit the agency records, concluding that the Montana Supreme Court had not given it authority to reopen the matter. *Glick*, 528 P.2d at 687.

The state appealed again and the Montana Supreme Court affirmed, explaining it had remanded the case "for action not inconsistent with" its opinion,

which "clearly stated that the case had to be returned to the district court recomputation of average hours worked by each plaintiff." *Glick*, 528 P.2d at 687. The Court found there was ample evidence to the support the district court's decision on remand, and found the state's argument that the summary was inaccurate came too late because the summary was introduced without objection at trial, and the agency records it sought to introduce on remand had been in the state's possession since the lawsuit first began. *Glick*, 528 P.2d at 687. The Court held that to allow the state to introduce the evidence "now would violate the terms of the remand" and would violate "the policies reflected in the legal concepts of res judicata, law of the case, and perhaps even stare decisis." *Glick*, 528 P.2d at 687. In the end, the Court affirmed the district court's finding on the ground that the remand order "did not give [the court] jurisdiction to reopen this portion of the record for the receipt of new evidence." *Glick*, 528 P.2d at 687.

As argued by BNSF, however, *Glick* is materially distinguishable in two respects. First, unlike evidence of the Glendive Diesel Shop closure, the evidence the state sought to introduce on remand *Glick* had been in in the state's possession since the lawsuit first began. *Glick*, 528 P.2d at 687. Here, in contrast, evidence of the shop closure did not exist at the time of the contested case hearing in October 2018 and the Hearing Officer's original decision in November 2019. Because the evidence that BNSF sought to introduce on remand was not available when the

case was first presented to the Hearing Officer, *Glick* is factually inapposite.

*Glick* is also distinguishable on legal grounds because it involved a remand after final judgment had been entered by the district court. The Montana Supreme Court reasoned that allowing the state to introduce additional evidence on remand after a final judgment had been entered by the district court would run afoul of "the policies reflected in the legal concepts of res judicata, law of the case, and perhaps even stare decisis." *Glick*, 528 P.2d at 687. Here, in contrast, there had been no final judgment or final agency decision when the MHRC remanded the matter to the Hearing Officer for further proceedings.

As argued by BNSF, the Hearing Officer's refusal to consider evidence of the shop closure effectively ignores the general principles of the mandate rule as set forth in *Zavarelli v. Might*, 779 P.2d 489, 493 (Mont. 1989). *Zavarelli* recognized that when a case is "[o]n remand, the trial court may consider or decide any matters left open by the appellate court, and is free to make any order or direction in further progress of the case, not inconsistent with the decision of the appellate court, as to any question not presented or settled by such decision." *Zavarelli*, 779 P.2d at 493. The MHRC's remand order directing the Hearing Officer to redetermine front pay damages based on the evidence of record did not prohibit the Hearing Officer from reopening that record to consider new and material evidence. Accordingly, the Court finds that permitting BNSF to introduce

such evidence would not have violated the terms of the remand.

BNSF additionally asserts that the Hearing Officer's interpretation of the remand order is not consistent with the equitable nature of discrimination remedies and the principle that the MHRA is intended "to return employees who are victims of discrimination to the position they would have occupied without the discrimination." *Vortex Fishing Sys. v. Foss*, 38 P.3d 836, 840 (Mont. 2001). See also *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1350 (11th Cir. 2000) (recognizing that "[a]warding front pay to a plaintiff who ultimately would have been terminated confers a windfall upon that plaintiff"); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1182 (2d Cir. 1996) (reasoning that "[b]ecause the plaintiff's job was scheduled to be eliminated in any case, an award of front pay beyond that date would have impermissibly placed her in a better position than she should have been"). BNSF argues Rod's employment with BNSF would have ended when the Glendive Diesel Shop closed in July 2020, and submits that the Hearing Officer's decision to award 13 years of front pay constitutes an impermissible windfall because it effectively puts him in a better position than he would have occupied without the discrimination.

Rod disagrees with BNSF's assertion that the shop closure would necessarily have ended his employment at BNSF, and argues the issue is disputed. Rod has submitted a declaration from his union representative, John Denny, who

states that BNSF gave machinists at the Glendive Diesel Shop several options to continue working for BNSF, including exercising their seniority rights to bid on other machinist positions in North Dakota and on jobs throughout BNSF's system; transferring to another craft; or exercising their rights to lay off or furlough indefinitely in the hopes that work within the machinist's craft would return to Glendive, at which time they could then exercise their seniority rights to return to work. (Doc. 17-1 at 2). While Rod testified at the contested case hearing in October 2018 that he was not willing to relocate (Doc. 20-1 at 3; Hearing Tr. 47:13-48:1) his testimony might well have been different had he still been working for BNSF when the shop closed in July 2020. Denny explains that at the time of the shop closure, Rod was number one on the machinist's seniority roster for his assigned district and the above options for continued employment would have been available to him had BNSF not removed him from service prior to the shop closure. Thus, as Rod contends, whether Rod's employment necessarily would have ended with the Glendive Diesel Shop's closure is disputed.

The Court concludes the MHRC applied the incorrect standard of review, and the Hearing Officer erred as a matter of law in declining to reopen the record to consider evidence of, or take judicial notice of, the Glendive Diesel Shop closure. BNSF argues that, "[a]s an equitable remedy, closure of the [shop] on July 7, 2020 dictates that [front pay] damages to Rod cease and be limited to

$21,811.48" using the OAH's methodology, as set forth by BNSF in a supporting exhibit. (Doc. 20 at 28; Doc. 20-5). As explained above, however, whether Rod's employment at BNSF would have ended when the shop closed in June 2020 is disputed. Thus, the proper remedy is to remand this case to agency to consider evidence of the Glendive Diesel Shop closure and reassess the front pay damages award.[3]

## IV.   **Conclusion**

For the reasons stated above,

IT IS RECOMMENDED that the agency's disability discrimination determination be affirmed, and this matter be remanded to the agency for further proceedings relating to front pay damages consistent with this opinion.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendation of the United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies

//

//

---

[3]  Because remand is proper for the reasons stated above, the Court need not address BNSF's argument that the Hearing Officer misapprehended the medical evidence in concluding that Rod could work for 13 more years.

served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.

DATED this 15th day of February, 2023.

_____
Kathleen L. DeSoto
United States Magistrate Judge